IN THE UNITED STATES DISTRICT COURT FOR
THE MIDDLE DISTRICT OF TENNESSEE
AT NASHVILLE

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| AREDIA® AND ZOMETA® | ) | |
| PRODUCTS   LIABILITY LITIGATION | ) | |
| | ) | No. 3:06-MD-1760 |
| (MDL No. 1760) | ) | |
| | ) | JUDGE CAMPBELL |
| This Document Relates to: | ) | |
| | ) | MAGISTRATE JUDGE BROWN |
| Case No. 3:08-cv-00932 (Betty Foster) | ) | |

**PLAINTIFF'S RESPONSE IN OPPOSITION TO NOVARTIS
PHARMACEUTICAL CORPORATION'S MOTION FOR
SUMMARY JUDGMENT IN *BETTY FOSTER CASE***

        Comes the Plaintiff, Betty Foster and responds in opposition to Defendant

Novartis Pharmaceutical Corporation's motion for summary judgment as follows:

**Statement of Facts**

        Betty Foster was married and a retired school teacher, age 58 in September of

1999 when Dr. Ross Kerns diagnosed her with breast cancer.  (Statement of Undisputed

Facts, hereinafter referred to as "SUF" 8).  That same month Ms. Foster was begun on a

monthly dose of Aredia.  *Id.* 11.  Ms. Foster received Aredia monthly for 27 months and

in January of 2002, she began receiving Zometa and continued monthly doses of Zometa

until the last dose in June of 2004.  *Id.* at 12.  So after 27 months of Aredia, Ms. Foster

then received Zometa for 29 months.  *Id.*

        Ms. Foster's dental health was described by her general dentist, Dr. Martin C.

Wilhelm.  Excerpts of Dr. Wilhelm's deposition are Exhibit 1.  In 1994, Dr. Wilhelm

diagnosed Ms. Foster as having moderate periodontal disease.  Wilhelm Dep. pp. 39-40.

By March 14, 2002, Ms. Foster's periodontal disease was classified as moderate to severe. *Id.* 41. When Ms. Foster saw her dentist on September 28, 1999, she told him that she had been diagnosed with breast cancer and that she was taking Aredia. *Id.* p. 52. On that visit she was noted to have a tooth, no. 31, which was sensitive to percussion. *Id.* pp. 53-54. Dr. Wilhelm testified that she may have needed endodontic treatment at that time. *Id.* He thought her tooth was possibly cracked. *Id.* p. 55. By October of 2002, Ms. Foster's tooth no. 31 had broken. The tooth was crowned. *Id.* Ms. Foster next saw her dentist on February 5, 2001. At that time another tooth, no. 3, was broken. Ms. Foster saw Dr. Berlin, an endodontist and discussed a root canal of tooth no. 31 but this was not done. *Id.* p. 60. By January 15, 2003, tooth no. 31 was infected and aching. *Id.* at p. 61. In May of 2003, Ms. Foster developed exposed bone at tooth 31. Dr. Widloski performed a removal of exostosis on May 14, 2003 which is bone that was coming through Ms. Foster's jaw at tooth no. 31. *Id.* at 66. In July of 2003, Dr. Widloski removed more bone from Ms. Foster's jaw and extracted tooth no. 31. *Id.* at p. 69. Dr. Wilhelm notes that this was the same tooth that he saw problems with in 1999. *Id.* at p. 69. Ms. Foster continued to have pain on her lower right jaw *Id.* at 70 and her dentist made a night guard hoping to relieve some of the pressure. *Id.* at pp. 73-74. On October 1, 2003, Ms. Foster had root canals on tooth no. 23 and no. 24 (letter from Dr. Sullivan, Wilhem Ex. 6), attached as <u>Exhibit 2</u> to this response. On February 13, 2004, Ms. Foster complained of facial pain to her oncologist, Dr. Kerns. Kerns Dep. p. 69. Excerpts of Dr. Kerns Dep. are <u>Exhibit 3</u>. Dr. Kerns ordered x-rays and a PET scan and verified that it was not metastatic cancer. Kerns Dep. pp. 70-74. Ms. Foster was ultimately referred to Dr. Eric R. Carlson, a maxillofacial surgeon at the University of Tennessee Memorial

Hospital. Dr. Carlson performed surgery on August 13, 2004, performing a permanent resection on her right mandible. Dr. Carlson's post-operative diagnosis was bisphosphonate-induced osteonecrosis of the right mandible. Widloski medical record, document B-0100-0011, Exhibit 4 attached. Dr. Carlson continued to treat Ms. Foster and performed later surgeries. His diagnosis remained constant, bisphosphonate-induced osteonecrosis of the mandible. Operative Report 3/15/05, document B-0004-0039, Exhibit 5 attached.

Dr. Carlson wrote Ms. Foster's oncologist, Dr. Kerns on August 3, 2004 and advised him of the diagnosis of bisphosphonate-induced osteonecrosis of the jaw. Kerns Dep. p. 76. It was the first time Dr. Kerns had heard that Aredia and Zometa could cause osteonecrosis of the jaw. *Id.* Dr. Carlson also gave Dr. Kerns a copy of Dr. Ruggiero's article. *Id.* at 77. On September 23, 2004, Dr. Kerns' office notes reflect that he discontinued Zometa for Ms. Foster. Dr. Kerns testified that Ms. Foster told him she did not wish to take any Zometa or Aredia. *Id.* at 80. Ms. Foster died on September 22, 2006.

## Summary Judgment Standard

### A. Defendant must establish the absence of a genuine issue for trial.

A party seeking summary judgment bears the initial burden of showing the absence of a genuine issue of material fact. See *Holiday v. City of Chattanooga*, 206 F.3d 637, 640 (6th Cir. 2000). It is not the trial court's role to weigh evidence or make credibility determinations in ruling upon a motion for summary judgment. See *Anderson v. Liberty Lobby, Inc.,* 477 U.S.242, 250, 106 S.Ct. 2505, 2515, 91 L.Ed.2d 202 (1986). It is the trial court's duty to determine whether there is a genuine issue of material fact for

trial.  *Id.*  A genuine issue of material fact exists for trial when viewing the record and all reasonable inferences drawn from it in a light most favorable to the opponent of the motion a reasonable jury could return a verdict in favor of that party.  *Id.* at 248, 106 S.Ct. at 2510, 91 L.Ed.2d 202; *Holiday*, 206 F.3d at 690.  The moving party must "clearly and convincingly" establish the absence of material facts.  <u>See</u> *Buchanan v. Williams*, 434 F.Supp.2d 521, 528 (M.D. Tenn.  2006).   Any doubt as to the absence of a genuine issue for trial is resolved against the moving party.  <u>See</u> *Watson v. Norris*, 729 F.Supp. 581, 582 (M.D. Tenn. 1989).  The evidence of the opponent of the motion is to be believed. *Rebel Motor Freight, Inc. v. Freeman Drywall Company*, 914 F.Supp. 1516, 1520 (W.D. Tenn. 1994).


<u>**Argument**</u>

<u>**I.  Plaintiff's Claims are not Barred by the Tennessee One Year Statute of Limitations.**</u>

In Defendant's argument it asserts that Betty and her husband, Robert , were told by the OMS Dr. Carlson that the cause of Ms. Foster's ONJ was "bisphosphonates" on her first visit, July 27, 2004 or her second visit, August 2, 2004.    The Defendants correctly state that the Plaintiff's suit was filed September 15, 2005.  At the time the *Foster* suit was filed, a class action suit was pending and awaiting a class certification hearing.  The class action was filed in December 2004.

Without reaching the factual dispute as to when the Plaintiff knew or should have known of the cause of her injury, the Court should, as a matter of law, reject the Defendant's assertion that Plaintiff's suit is barred by the statute of limitations.  On

September 15, 2005, when the Plaintiff filed her suit there was pending in the U.S. District Court for the Eastern District of Tennessee a class-action complaint under Docket No. 3-04-CV-586 styled *Sandra Thorn, Individually and on behalf of others similarly situated v. Novartis Pharmaceuticals Corporation* filed December 10, 2004. Docket entries 1, 2, and 16 of that case are the initial class-action complaints and two amended complaints. This case, No.3:08-cv-00932 in the Middle District of Tennessee was the first case filed in this Court. Ms. Foster was one of the original Plaintiffs in this case. The east Tennessee case was dismissed without prejudice by Order which was docket entry 101 in case 3:04-cv-00586. In *American Pipe and Construction Co. v. Utah,* 414 U.S. 538 (1974), the U.S. Supreme Court held:

> The commencement of a class-action suspends the applicable statute of limitations as to all asserted members of the class who would have been parties had the requirement of Rule 23(a)(1) been met, and here where respondents, who were purported members of the class, made timely motions to intervene after the District Court had found the suit inappropriate for class-action status, the institution of the original class suit tolled the statute of limitations for respondents.

*Id.* at 338. The Court described this as "judicial tolling of the statute of limitations." *Id.*

Later, the Supreme Court expanded this Doctrine of Judicial Tolling of the statute of limitations ruling that a class-action tolls the period of limitations as to potential members of the class whether they choose to intervene or file separate, individual actions during or following the denial of class certification. *Crown, Cork & Seal Company, Inc., v. Parker,* 462 U.S. 345, 354 (1983). While not never squarely addressing the issue, the Tennessee Supreme Court has stated in *Tigg v. Pirelli Tire Corporation,* 232 S.W.3d 28, 34 (2007), that the majority of other states have adopted a rule allowing equitable tolling during the pendency of class-actions. The Tennessee Supreme Court cites *American Pipe*

and notes ". . . [I]t is appropriate to toll the statutes of limitations not only for the named Plaintiffs but also for those claimed members of the class who might subsequently participate in the suit. . . ." *Tigg* at p. 32.

> Potential class members would be induced to file protective motions to intervene or to join in the event that a class was later found unsuitable. . . . [A] rule requiring successful anticipation of determination of the viability of the class would breed needless duplication of motions. [citing *American Pipe*] *Id.* at p. 34.

The Tennessee Supreme Court also cited *Crown, Cork & Seal Company, Inc., v. Parker,* 462, U.S. 345 (1983) noting that in Federal Courts when a Court denies certification of the class the members of the proposed class may then file individual lawsuits or intervene in the pending action within the statutory limitations period which begins to run again on the date that the Court denies class-action status. *Tigg* at p. 32.

The Plaintiffs in *Tigg* sought to rely on a class-action which was filed in 1995 and subsequently dismissed without a class certification ruling. The Plaintiffs filed suit in August 2002 hoping to rely on the six year statute of limitations running from the dismissal of the previous class action. The Court stated:

> In this instance, even if we were to adopt a class action tolling doctrine, we would hold that the Plaintiffs are barred by the statute of limitations on their claim because the previous Plaintiffs failed to protect the other potential members of the class. The previous Plaintiffs failed to satisfy the burden upon the party seeking certification to act promptly and practicable. The previous Plaintiffs did not nothing to seek class certification after the filing of the 1995 complaint. Failure of the previous Plaintiffs to seek certification within the period provided under Local Rule 26.14 of the Davidson County Circuit Court has the same effect upon the tolling of the statute of limitations as denial of class certification. *Tigg* at p. 35.

The Tennessee Supreme Court did not squarely adopt *American Pipe* or *Crown, Cork & Seal Company, Inc.* However, the Court's detailed and favorable discussion of

6

the class action tolling doctrine leaves no doubt that this is the rule applicable to Tennessee statute of limitations.

Once the statute of limitations has been tolled, it remains tolled for all members of the putative class until class certification is denied. At that point, class members may choose to file their own suits or to intervene as Plaintiffs in the pending action. *Chardon v. Fumero Soto,* 462 U.S. 650, 661 (1983); *Andrews v. Orr*, 851 F.2d 146, 148 C.A. 6 (Ohio) (1988).

## II. The Defendant's FDA Approved Warnings are not Adequate.

The Defendant seems to argue that the mere fact that the FDA approved its labelling somehow defeats Plaintiff's claim. It is difficult to even follow the proposed argument. The fact of the matter is that the Defendant failed to provide information which it knew or should have known concerning risks associated with its product.

### Novartis's warnings were neither adequate nor timely.

This Court has already considered and determined that plaintiffs have presented sufficient evidence of the inadequacy of Novartis's warnings to overcome Novartis's case-wide motion for summary judgment on that issue. *See* Docket entry 2767 (District Court's memorandum opinion denying Defendant's motion for summary judgment on the adequacy of warnings). The Court expressly stated, "[T]here are a myriad of factual issues here." *Id.* Nothing about the facts of this case alters the Court's previous case-wide determination on this issue.

Ms. Foster had been taking Aredia and Zometa years before Dr. Kerns was provided any warning from Novartis about the association between bisphosphonates and ONJ. As previously shown by Plaintiffs in this litigation, however, Novartis, had notice

7

of the risk of ONJ with bisphosphonate drugs at least four separate ways even prior to the approval of the drug.

> (a)    **The diseases osteopetrosis and pycnodysostosis mimic the mechanism of action of the drug, and each cause ONJ.**

Bone cells in the human body constantly regenerate themselves through a process known as remodeling. In remodeling, the old bone is dissolved or "resorbed", and new bone is generated. Osteoclasts are the cells that resorb bone. Osteoblasts build new bone. Bisphosphonate drugs work by killing or inhibiting the action of the osteoclasts cells, thus preventing the resorption of bone that is part of the remodeling cycle.

Any reasonable investigation into what happens when osteoclasts are disabled would have found two diseases in humans are characterized by osteoclast dysfunction. Such an investigation further would have found that these two diseases, osteopetrosis and pycnodysostosis (sometimes spelled "pyknodysostosis"), each involve necrotic jaw bone, most particularly after tooth extraction. In June 2003, after the explosion of ONJ cases was made known to Novartis, Novartis employee Dr. Carsten Goessl analyzed whether or not the drug was causing the reported epidemic. In an e-mail to other Novartis employees, Dr. Goessl noted the obvious biological linkage between osteopetrosis and pycnodysostosis, diseases that had been recognized for decades, and the mechanism of action of the drugs and concluded that the drugs were likely the cause of the reported cases of ONJ. (Exhibit 36 to Second Germany Decl.) "Sorry," he wrote, in seeing the link between the drugs and ONJ. *Id.*

Novartis's drugs inhibit osteoclasts. Novartis could reasonably be expected to have conducted research on osteoclasts prior to approval of the drugs to determine if

there were any side effects associated with inhibition of osteoclasts. Either Novartis did this research and ignored it, or it was negligent in failing to conduct this research until Dr. Goessl did it in June 2003. Either way, by researching the effect of turning off osteoclasts, Novartis either had or reasonably could have had notice of this side effect even before approval of the drugs.

(b) **Animal models showed ONJ in rats exposed to bisphosphonates as early as 1983.**

In 1983, Dr. Jack Gotcher and Dr. W.S.S. Jee published an article explaining their findings in an experiment where rats were exposed to a bisphosphonate drug, clodronate. The experiment was performed to test the effect of clodronate on periodontal disease in the animals. Dr. Gotcher's and Dr. Jee's findings were startling. They saw exposed, devitalized (dead) bone protruding in the oral cavities of several of the rats treated with clodronate. None of the rats given the placebo experienced this condition.

Novartis expert Dr. Janet Arrowsmith-Lowe goes to great lengths to try to explain how it would have been ***impossible*** for Novartis to find this article in its literature search done as part of the approval process for Aredia and Zometa. There is only one problem with Dr. Arrowsmith-Lowe's assertion: Novartis's head of preclinical studies, Dr. Jonathan Green, testified that he had the Gotcher and Jee article in his files as early as 1986 (Exhibit 4 to Germany Second Decl.), which is at least four years prior to the initial approval of Aredia and nearly fifteen years prior to the approval of Zometa. Notably, Dr. Green was in charge of the preclinical studies leading to the approval of Zometa. *Id*.

The Gotcher and Jee article was a clarion call to Novartis to be on the lookout for jaw necrosis when testing Aredia and Zometa. Unfortunately for the thousands of people who would develop ONJ from their drugs, the call was ignored by Novartis.

(c)     **Cases of ONJ appeared in the Aredia and Zometa clinical trials, but were unrecognized or ignored by Novartis, and the initial product labels/package inserts contained no information regarding ONJ.**

After the epidemic of cases of ONJ caused by Novartis's drugs first became public, Novartis tried for nearly two years to discredit the obvious link by claiming that no cases of ONJ appeared in the Zometa and Aredia clinical trials. Later, when the FDA asked Novartis to analyze its clinical trial data, Novartis had to admit: (1) that in its clinical trials, the protocols did not include an examination of the mouth or specific data for oral health; and (2) it had never gone back and done a full review of even the limited data available to it from the clinical trials.

When it finally looked at the clinical trial data—its prior erroneous statements notwithstanding—Novartis stunningly found six cases of ONJ in the Aredia and Zometa clinical trials. Every single patient who got ONJ was taking Aredia or Zometa. There were no placebo cases. Novartis documented these ONJ cases in a number of PowerPoint presentations and submitted information about them to the FDA. Incredibly, Novartis now takes the position in this litigation that the six cases of ONJ that it belatedly revealed to the FDA were not really ONJ cases at all.

These denials of admissions already made and documented outside of litigation ring hollow. Novartis should have done oral exams as part of its clinical trial protocol, but failed to do so. Despite this shortcoming in the trial design and data collection, the

minimal amount of data available shows that at least six cases of ONJ occurred in the clinical trials, all in persons taking the Novartis drug. These are cases found even absent an attempt to monitor the oral health of the clinical trial patients. The drug labels failed to even mention ONJ until the latter part of 2003. At that point, Plaintiff was already suffering from ONJ. If Novartis had properly met its duty to warn of all side effects from its drugs, the labels would have informed doctors and patients about ONJ immediately upon introduction of either product to market.

(d)    <strong>Defendant knew or should have known about Phossy Jaw.</strong>

To this point, the discussion of how Novartis had notice of the ONJ side effect before Aredia and Zometa were approved has, in some ways, been overly generous to the company. Novartis could have learned about this side effect by recognizing the work place disease "phossy jaw," which afflicted many persons working in match factories in the 1800s and early 1900s. As described in Plaintiffs' opposition to Novartis's motion to exclude the testimony of Plaintiffs' expert Professor Paul Hanson, numerous doctors, *including at least three of Novartis's testifying experts in this litigation*, have made the linkage between ONJ and phossy jaw.

The foregoing is just a sample of the voluminous material that the Court has already considered and deemed sufficient to overcome Novartis's summary judgment motion that its warnings were adequate. Plaintiff incorporates by reference, pursuant to Rule 10(c), *Federal Rules of Civil Procedure*, Plaintiff's opposition to Novartis's motion for summary judgment on the adequacy of Aredia and Zometa warnings (Docket entry 2614) and materials cited therein in further opposition to Novartis's assertions that its warnings were adequate and timely in this case.

## A. The Statutory Presumption is Rebuttable.

Defendant's memorandum Part II thereof states that Plaintiff's failure-to-warn claim is subject to the Tennessee Products Liability Act (T.C.A. 29-28-101, et sec.) and that under T.C.A. 29-28-104 the rebuttable presumption contained therein bars Plaintiff's cause of action. Amazingly, the Defendant resorts to a Michigan statute and Michigan cases to bolster this argument.

T.C.A. 29-28-104 states that compliance by a manufacturer with "any federal or state statute or administrative regulation existing at the time the product was manufactured," shall raise a "rebuttable presumption that the product is not in an unreasonably dangerous condition."

The Defendant took a similar position in this MDL earlier this year moving to dismiss approximately 40 Florida cases with a similar argument. In *In Re: Aredia and Zometa Products Liability Litigation,* 2010 WL 813459, (Docket entry 3131 of case 3:06-01760) this Court wrote:

> Plaintiffs make far more than one argument concerning rebutting the statutory presumption. These Plaintiffs are not relying solely on the argument that FDA approvals were improperly obtained. The Court's prior ruling was limited to the argument asserted by *that* Plaintiff and, therefore, is not preclusive to these Plaintiffs' claim.
>
> The statutory presumption at issue is a presumption of no liability; that is, the Court and/or jury must presume that a product is not defective or unreasonably dangerous if the product complies with certain codes, regulations, and standards. It may be undisputed that Defendant is entitled to this presumption of no liability, but Defendant appears to forget that the presumption is rebuttable.

*Id.* at p. 2. The Court went on to state:

> The Court finds that Plaintiffs have offered proof sufficient to avoid summary judgment on this issue. The statutory presumption will apply at trial but Plaintiffs have sufficiently raised genuine issues of material

12

fact as to their ability to rebut that presumption. A jury will have to determine whether the presumption has been overcome in each case. *Id.*

The Defendant cited *Flax v. Daimler Chrysler Corporation,* 272 S.W.2d 521, 536 (Tenn.2008) for the proposition that T.C.A. 29-28-104 was designed to give refuge to the manufacturer who is "operating in good faith and in compliance of what the law requires him to do." The Defendant ignored the remainder of the Tennessee Supreme Court's opinion. In that the Court said:

> The statute was not designed to provide immunity from punitive damages to a manufacturer who is aware that compliance with a regulation is insufficient to protect users of the product. While evidence of compliance with government regulations is certainly evidence that a manufacturer was not reckless, it is no dispositive. [Citations omitted]. To hold otherwise would create an overly inflexible rule that would allow some manufacturers knowingly engaged in reprehensible conduct to escape the imposition of punitive damages. *Id.* at p. 536.

### B. NPC Did Not Fulfill its Duty to Warn.

Novartis's first argument is that it is entitled to summary judgment on Plaintiff's failure-to-warn claims under the learned intermediary doctrine because it warned Plaintiff's oncologist, Dr. Kerns. Novartis did not warn Plaintiff's oncologist. Dr. Kerns first prescribed Aredia to Ms. Foster in 1999. Kerns Dep. at p. 41. He switched Ms. Foster to Zometa in January 2002, shortly after it obtained FDA approval. *Id.* at 64. At the time Dr. Kerns prescribed Aredia and Zometa to Ms. Foster, he did not know those drugs caused ONJ. *Id.* at p. 45. Dr. Kerns learned of the relationship between IV bisphosphonates and ONJ from Mrs. Foster's maxillofacial surgeon, Dr. Carlson in August, 2004 after Ms. Foster was diagnosed with BIONJ. *Id.* at 77-79. The Plaintiff has submitted a statement of 235 undisputed facts showing that the Defendant knew or

13

should have known of the danger that its IV bisphosphonate drug posed to patients' jaws. Clearly, a jury should be have an opportunity to review this evidence and determine whether or not NPC met its obligation.

Dr. Kerns testified that knowledge of the fact that bisphosphonate therapy can cause osteonecrosis of the jaw has changed his practice. He testified that all patients who are on these agents are cautioned about invasive dental procedures, Kerns Dep. p. 81, and, that his office instructs patients on the importance of dental hygiene and avoiding dental procedures if possible. *Id.* 81-82.

### III. NPC is Liable Under the Plaintiff's Negligence *Per Se* Claim.

Tennessee Courts will apply negligence *per se* to violation of FDCA, 21 U.S.C. §301, et sec. and regulations promulgated pursuant thereto. In *Rains v. Bends of the River,* 124 S.W.3d 580 (Tenn.App.2003) the parents of a minor who committed suicide with a handgun brought suit against a retailer who sold the minor ammunition in violation of the Federal Gun Control Act. Judge Koch, now Justice Koch, cited with approval *Restatement (Second) of Torts, § 286.* That section of the *Restatement* provides as follows:

> The Court may adopt as the standard of conduct of a reasonable man the requirements of a legislative enactment or an administrative regulation whose purpose is found to be exclusively or in part
>
> (a) to protect a class of persons which includes the one whose interest is invaded, and
>
> (b) to protect the particular interest which is invaded, and
>
> (c) to protect that interest against the kind of harm which has resulted, and
>
> (d) to protect that interest against the particular hazard from which the harm results.

14

*Rains* states that negligence *per se* doctrine does not create a new cause of action, rather it is a form of ordinary negligence. The doctrine enables Courts to use a penal statute to define a reasonably prudent person's standard of care. *Rains* at 589. The Court says two threshold questions must be answered, e.g., 1) whether the Plaintiff belongs to the class of persons the statute was designed to protect; and 2) whether the Plaintiff's injury is the type of injury that the statute was designed to prevent. *Id.* An analysis of the case at bar clearly shows that Ms. Foster's oncologist, Dr. Kerns was not warned of the risk. Ms. Foster was a member of the class of persons which the regulations are designed to protect. Ms. Foster's injury is the type of injury that the regulation is designed to guard against. Dr. Kerns testified that he modified his practice and the warnings that he conveys to his patients now that he is aware of the risks. Under these circumstances it is clear that the doctrine of negligence *per se* is appropriately applied.

### IV. Plaintiff has Ample Evidence that the Aredia and Zometa Prescribed for Ms. Foster were Unreasonably Dangerous.

Defendant first cites T.C.A. 29-18-104 for the proposition that the rebuttable presumption contained therein "cannot be overcome." See Plaintiff's brief, p. 7-8 *infra* where this argument has already been addressed.

T.C.A. 29-28-105(a) provides that an injured Plaintiff may recover against a manufacturer if the Plaintiff is harmed because the product was furnished to the Plaintiff in a defective condition <u>or</u> in an unreasonably dangerous condition. It is clear that under Tennessee law injuries caused by a defective product or in an unreasonably dangerous product, both form a basis for recovery. Tennessee recognizes both the "consumer expectation test" and the "prudent manufacturer test."

15

The straight-forward, unambiguous language of our statute establishes two distinct tests for ascertaining whether a product is unreasonably dangerous: The consumer expectation test and the prudent manufacturer test. . . . The two tests are neither mutually exclusive nor mutually inclusive. *Ray by Holman v. Bic Corp.,* 925 S.W.2d 527, 531 (Tenn.1996).

This is a motion for summary judgment. There is ample evidence from which the finder of fact could determine that in the eyes of the prescribing physician, the Defendant's product was unreasonably dangerous and certainly that the prudent manufacturer would have provided proper warnings. The Defendant advances no argument which would permit summary judgment on these issues. The Defendant would ask this Court to rule that a prudent manufacturer would fail to warn of a substantially dangerous side effect caused by its drugs in violation of federal statute and regulation. That argument makes no sense.

### V. Defendant is not Entitled to Protection of Comment K.

The Defendant is not entitled to avoid liability on the basis of *Restatement (Second) of Torts,* Section 402(a) Comment K.

Comment K states in parts:

An outstanding example is vaccine for the Pasteur treatment of rabies, which not uncommonly leads to very serious and damaging consequence when it is injected. Since the disease itself invariably leads to a dreadful death. . . .

The Comment notes that under these circumstances, the marketing and use of the vaccine is fully justified. But the Comment K has very specific <u>requirements</u>.

The seller of such products, again with the qualification that they are properly prepared and marketed, <u>and proper warning given</u>, where the situation calls for it, is not to be held strictly liable for the unfortunate consequences attending their use. . . . *Id.*

Even if a Court should consider that Aredia and Zometa qualify under the definition in Comment K, the Court should recognize that the basis for the Plaintiffs' causes of action are the Defendant's failure-to-warn of side effects which Defendant knew or in the exercise of ordinary care could have known. Nothing in Comment K affords the Defendant "protection" under these circumstances. The Defendant cites *Pittman v. Upjohn Co.,* 890 S.W.2d 425 (Tenn.1994). This is a case where an adult grandson of a diabetic patient ingested micronase, his grandmother's diabetes medicine, and was seriously injured. The Court said:

> . . . warnings concerning prescription drugs generally are adequate when they contain full and complete disclosure of potential adverse reactions to the drugs. A reasonable warning not only conveys a fair indication of the dangers involved, but also warns with a degree of intensity required by the nature of the risk. *Pittman* at 429.

Nothing in the *Pittman* case changes the Defendant's obligation to warn learned intermediaries such as Dr. Kern of dangerous side effects which it knew or should have known accompanied the use of its drugs and which could be minimized as now acknowledged by the Defendant's current warnings.

## VI. There is Ample Admissible Evidence of Specific Causation.

As demonstrated by the Plaintiff's statement of facts after nearly five years of intravenous bisphosphonate therapy, Ms. Foster was diagnosed by Dr. Eric Carlson, a maxillofacial surgeon at the University of Tennessee as suffering from bisphosphonate-induced osteonecrosis of her mandible. Dr. Carlson maintained this diagnosis and performed several debridement surgeries on Ms. Foster. The proof shows that Ms. Foster continued to experience pain and disability from this condition until her death.

The Plaintiff employed Dr. Yoh Sawatari, Assistant Professor of Clinical Surgery in the Division of Oral and Maxillofacial Surgery at the University of Miami to review Ms. Foster's medical records and to furnish an opinion as to the cause of Ms. Foster's necrotic jaw. Dr. Sawatari's curriculum vitae is attached as Exhibit 6. Dr. Sawatari's Rule 26 Report is Exhibit 7 to this memorandum.

Dr. Sawatari utilized a differential diagnosis for Mrs. Foster. This is a well-known and widely accepted methodology to reach an opinion about causation. The Sixth Circuit defined a differential diagnosis as the method by which a physician determines what disease process caused a patient's symptoms. *Hardyman v. Norfolk & W. Ry. Co.*, 243 F.3d 255, 260 (6th Cir. 2001). The physician considers all relevant potential causes of the symptoms and then eliminates alternative causes based on a physical examination, clinical tests, and a thorough case history." *Id.* A differential diagnosis is "an appropriate method for making a determination of causation for an individual instance of disease." *Best v. Lowe's Home Ctrs., Inc.*, 563 F.3d 171, 178 (6th Cir. 2009) (*citing Hardyman*, 243 F.3d at 260). A differential diagnosis is "a standard scientific technique of identifying the cause of a medical problem by eliminating the likely causes until the most probable one is isolated." *Best*, 563 F.3d at 178 (*citing Hardyman*, 243 F.3d at 260).

This Sixth Circuit adopted the following test for a reliable differential diagnosis in *Best*:

> A medical-causation opinion in the form of a doctor's differential diagnosis is reliable and admissible where the doctor (1) objectively ascertains, to the extent possible, the nature of the patient's injury . . . (2) "rules in" one or more causes of the injury using a valid methodology, and (3) engages in "standard diagnostic techniques by which doctors normally rule out alternative causes" to reach a

18

conclusion as to which cause is most likely. *Best*, 563 F.3d
at 179.

Dr. Sawatari met all of these requirements.  Dr. Sawatari ascertained the nature of the

Plaintiffs' injuries.  He started with an open mind.  He considered many causes and then

ruled them out, thereby leaving BRONJ and osteomyelitis as the only remaining causes.

Thereafter, he then concluded that BRONJ was the likely diagnosis and cause of the

Plaintiffs' necrotic bone and bisphosphonate use.

When Dr. Sawatari performed his differential diagnosis for Mrs. Foster, Mr.

Brown, and Mrs. Talley, he considered osteomyelitis.  He could not rule out

osteomyelitis as the cause of exposed bone to an absolute certainty.  However, he found

that osteomyelitis was very unlikely in each case and offered explanations why he could

not rule it out with absolute certainty:

> Q. Your report notes that the end of the
> 3 second full paragraph on the second page:
> 4 "Osteomyelitis could be considered a differential
> 5 diagnosis. However in this case, osteonecrosis
> 6 developed and then becomes secondarily infected with
> 7 oral pathogens."
>
> 8 A. Yes.
>
> 9 Q. My question is: How do you know that the
> 10 osteonecrosis came first and the infection came
> 11 second?
>
> 12 A. The clinical presentation. It appears as
> 13 if the bone appeared first, refractory to treatment,
> 14 continued to -- and I felt like it didn't fit the
> 15 picture of the osteomyelitis.
>
> 16 Q. But you agree that the infection could
> 17 have caused the bone to become exposed, correct?
>
> 18 A. Possibly. I don't often see that.

19

19 Q. Okay. Just because you don't often see it
20 doesn't mean it doesn't occur, correct?

21 A. Yes, it is a possibility.

22 Q. So my question is: How do you rule out
23 the possibility that that is what occurred with
24 Ms. Foster?

25 A. Through my personal experience, and I have
1 to rely on that because I'm formulating an opinion
2 on this case based on my own experiences and what I
3 know. I have seen far more cases of exposed bone
4 that got secondarily infected based on
5 bisphosphonates than I have seen osteomyelitis that
6 presented with exposed bone without bisphosphonate
7 use.

23 Q. And you indicated that there was no way --
24 correct me if I'm wrong -- there was no way you were
25 able to determine whether the infection was prior to
1 or came after the necrotic bone, correct?

2 A. Yes.

3 Q. And then I asked you, in Ms. Foster's
4 case, is there any way to tell which happened first,
5 and you referred back to your experience.
6 So my question is: How, in Ms. Foster's
7 case, could you say which came first?

8 A. I'm sorry. ***To clarify that, my notes --
9 as I was looking through the notes, the notation of
10 exposed bone came before any notation or evidence of
11 purulence or inflammation around that area, some
12 mandibular swelling, any characteristics of acute
13 infection.*** [Dr. Sawatari depo. in *Foster* at 289-92]

Dr. Sawatari concludes in his report:

These records demonstrate the definition of BIONJ with a history of
significant IV bisphosphonate administration and the failure of exposed
bone to heal over eight weeks.  In general, literature and experience
reveals that patients usually require approximately six months of IV
bisphosphonate administration before they present BIONJ.  This patient

had over five years of Aredia and Zometa.  This patient never received any radiation therapy. . . ."  Sawatari Report-Betty Foster, p. 2.

Dr. Sawatari confirmed in his report that he concurred with Dr. Eric Carlson's diagnosis of BIONJ.  Defendant makes a great deal of the fact that Dr. Sawatari's differential diagnosis did not take into consideration every conceivable comorbidity and/or risk factor.   In Tennessee it is clear that a Plaintiff's proof of causation does not have to exclude every other possible hypothesis as to the cause of the injuries, ".  .  . it generally being held that if a fair preponderance of the evidence discloses facts and circumstances proving a reasonable probability that the Defendant's negligence or want of skill was a proximate cause of the injury, the Plaintiff has supported his burden of proof sufficiently to justify a verdict on this behalf.  *Ison v. McFall*, 400 S.W.2d 243, 259-60 (Tenn.App.1964).

### VII.  CONCLUSION

The foregoing demonstrates that Novartis has not demonstrated the absence of genuine issues of material fact and that the trier of fact could reasonably find in the Plaintiff's favor.  Accordingly, Defendant's motion for summary judgment should be denied.

Respectfully submitted,


  /s/ C. Patrick Flynn
C. Patrick Flynn, BPR 2718
Plaintiffs' Steering Committee
FLYNN AND RADFORD
ATTORNEYS, P.C.
320 Seven Springs Way, Suite 150
Brentwood, TN 37027
(615) 370-9448

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing Plaintiff's Response in Opposition to Novartis Pharmaceutical Corporation's Motion for Summary Judgment in *Betty Foster case* was furnished by operation of the court's electronic case filing system on counsel of record in case No. 3:06-MD-1760 on this 1st  day of  September, 2010.

/s/ C. Patrick Flynn_____
C. Patrick Flynn, Esq.